UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSUE OLMAN MARTINEZ,<br><br>Defendant. | Case No.  15-cr-00575-WHO-1<br><br>**ORDER GRANTING MOTION TO SUPPRESS**<br><br>Dkt No. 52, 60 |

**INTRODUCTION**

The issue in defendant Josue Olman Martinez's motion to suppress is whether it was reasonable for officers to continue to search a property that they may have initially assumed was a single family residence once they knew or should have known that it was multi-unit.  The officers were searching for a gun used in a murder, had information that the mother of the suspect had hidden the gun at her residence, and were executing a warrant that allowed them to search the residence.  But when they arrived, they quickly learned that several other people lived at the premises.  After the officers determined where the mother resided, and searched her locked room, they broke into two other padlocked rooms, which were studio apartments, and searched a fourth room by consent and learned that it was a studio apartment as well.  Despite this knowledge, which indisputably showed that the warrant they were executing was overbroad, they broke into a fifth room, which was also padlocked, and found methamphetamine and cocaine belonging to Martinez.  This case is on all fours with *Mena v. Simi Valley*, 226 F.3d 1031 (9th Cir. 2000), where the Ninth Circuit found that officers were not entitled to qualified immunity for a very similar search.  I GRANT Martinez's motion to suppress.

United States District Court<br>Northern District of California

**BACKGROUND**

**A.  Getting a Search Warrant**

The search at issue occurred as a result of the investigation into an unrelated murder.  On May 31, 2015, 18-year old Jonathan Sauceda Caballero was shot in John McLaren Park in San Francisco.[1]  Motion to Suppress ("Mot.") at 1 (Dkt. No. 52).  The police quickly focused the investigation on Caballero's former girlfriend, 43-year-old Sylvia Lorena Montoya.  *Id.*  Based on surveillance footage, detectives determined that a young man, identified as Witness 2, was with Montoya and several other individuals near or at the time of the shooting.  *Id.* at 3.  Three weeks after the shooting, on June 23, 2015, Gang Task Force officers arrested Witness 2 and Montoya after witnessing the pair participate in an assault and attempted robbery.  *Id.*

On June 24 and 25, 2015, officers conducted a series of interviews with Witness 2.  After denying any involvement in the shooting, Witness 2 eventually admitted that he had been with Montoya and Caballero on the night of the murder.  *Id.*  Witness 2's description of the incident was corroborated by surveillance, physical evidence, and other witness statements.  Declaration of Sergeant Discenza ("Discenza Decl.") ¶ 5, (Dkt. No. 58-4).

On June 25, 2015, Witness 2 informed the police that he had additional information about the murder investigation and that he might know where the murder weapon was.  Mot. Ex. D-1 at 2. (Dkt. No. 52-4)*.*  Witness 2 said that he believed the gun was at Montoya's mother's house on Madrid Street.  *Id.*  Witness 2 offered reasons why he thought the gun was there: (1) he didn't think it was with Montoya; (2) they always put weapons there; (3) Montoya told him she put the gun there; and (4) he had seen weapons there before.  *Id.* at 3-6.

The officers asked Witness 2 a number of questions about the Madrid Street house.  Mot. Ex. D-1.  Witness 2 did not know its street address but was able to identify it from a photo as 751 Madrid Street.  Mot. Ex. D-3 at 3 (Dkt. No. 52-6).  The photos shown to Witness 2 are of a white building, set back from the street, with a small set of stairs leading to a gray door in the center.  Mot. Ex. E. (Dkt. 52-8).  A set of stairs to the right leads down to a second door.  *Id.*  Each door

---

[1] Unless otherwise indicated, the parties do not dispute the relevant facts.

1    has its own mailbox and doorbell next to it.  *Id.*  Witness 2 explained that Montoya's mother lived

2    in the main, upper unit, possibly with four other people, but "like two families also live separately

3    there."  Mot. Ex. D-1 at 7.  He also explained that another family lived separately in the lower

4    unit.  Mot. Ex. D-3 at 3.  He did not know whether there were any apartments in the back or

5    whether anyone else lived at 751 Madrid.  Mot. Ex. D-3 at 6.

6            That day, officers went to 751 Madrid Street and by observing the outside confirmed that it

7    was a white house with two doors in front evidencing a main floor and a basement unit.  Discenza

8    Decl. ¶ 7.  Witness 2 told officers that he had been to the house approximately three times.  Mot.

9    Ex. D-3 at 2.  He helped sketch a rough diagram of the main floor.  *Id.* at 4-5; Mot. Ex. F (Dkt.

10   No. 52-9).  This sketch shows that Montoya's mother, who Witness 2 knew only as Señora, lived

11   in a room in the back of the main unit, and that a family, comprising a mother and two young

12   children, lived in a room at the front of the house on the left.  Mot. Ex. F.

13           Officers asked Witness 2 several questions about the guns and where they were located in

14   the house.  Mot. Ex. D-3 at 6.  Witness 2 could not tell officers exactly where the guns were kept.

15   He guessed that they would be kept in Señora's room because that was the only place she could

16   keep them hidden.  *Id.*  At various times Witness 2 indicated both that he had seen the guns at 751

17   Madrid, and that he did not know where the guns were kept in the house.  Mot. Ex. D-3 at 2, 6.

18   He explained that there were approximately three guns in the house; one silver, one normal, and

19   one "sheriff style" and that one of them was a .22.  *Id.*

20           Officers determined that Rufina Murga, Montoya's mother, resided at 751 Madrid.

21   Discenza Decl. ¶ 7.  Murga had gone to the police station to retrieve Montoya's vehicle, which

22   had been seized during Montoya's arrest.  Murga's license indicated she lived at 751 Madrid.

23   Mot. Ex. A at 12.  A search of Ms. Murga's license number in the DMV database confirmed that

24   she had a vehicle registered at 751 Madrid.  *Id.*

25            Based on Witness 2's statements, the police submitted an affidavit the same day to obtain

26   a warrant to search the property at 751 Madrid Street and Ms. Murga's vehicle.  *Id.*  Sergeant

27   Discenza, the affiant, described the property as follows:

28           [S]ingle family attached home.  The residence is white in color with a gray door

United States District Court
Northern District of California

1    and the numbers 751 to the right of the door. The house is set back further than the
     other houses on the block. In addition any storage rooms, storage areas, containers,
2    trash containers of any kind located in the residence, any out building, sub areas,
     attic areas are to be searched as well.

3    Mot. Ex. B at 4. The affidavit does not mention that there was another family or any other people

4    living at the property.

5        To establish probable cause, Discenza explained that Witness 2 was a witness to the

6    Caballero murder and had been arrested on June 23, 2016 after officers witnessed him participate

7    in an assault and attempted robbery. Mot. Ex. A at 10. He described Witness 2's statements about

8    the guns at 751 Madrid as follows:

9
         Sgt. Sanders and Inspector Dedet conducted a more detailed interview and
10       [Witness 2] told them, the suspect Lorena Montoya's mother lived there and had
         been there about 3 times total. Montoya told him that she knew the police would
11       be coming to her home so she stashed firearms at her Mom's house on Madrid.
         [Witness 2] said the last time he was at the Madrid address was about a week ago.
12       He saw three guns at the house located on 751 Madrid. He said there was a short
         .22 caliber revolver, 1 black 6" or less .38 Caliber and one long barrel revolver,
13       chrome, .38 Caliber. Witness 2 also drew a schematic of the interior of the
         residence.
14

15   *Id.* at 11.

16   **B.  Executing the Warrant**

17       Police officers executed the warrant around 8:00 p.m. on June 25, 2016. Declaration of

18   Georgina Valente Cruz ("Valente Decl.") ¶ 5 (Dkt. No. 58-5). Officers knocked and announced at

19   the front door of the main unit in both Spanish and English. *Id.* No one answered, so officers

20   broke into the residence. *Id.* They then knocked on an interior door where Georgina Valente lived

21   with her 14-year-old son. *Id.* Valente opened her door.

22       The officers asked why she did not open the front door when they knocked. *Id.* Valente

23   offers two different versions of her response in separate declarations. In a declaration submitted

24   along with the government's first opposition to the motion to suppress, she states that she told

25   officers that she did not open the door because Carmen (the name she used for Murga) had told the

26   tenants not to. *Id.* Valente Decl. ¶ 5.[2] In an earlier declaration obtained by the defense, she states

27

28   _____
     [2] Valente did not refer to Murga as Rufina, the name known by the police.

                                            4

United States District Court
Northern District of California

1    that she did not open the door because she was afraid.  Mot. Ex. J at 4 (Dkt. No. 52-14).

2         Immediately following her explanation about the door, the officers asked which room

3    belonged to the mother of Silvia Montoya.  She directed them to it.  Valente Decl. ¶ 5.  Officers

4    broke into Murga's locked room and began to search it.  They conducted a simultaneous search of

5    two other rooms in the front of the house that were padlocked.  One belonged to El Flaco, an 18-

6    20 year-old man, and the other to Mirian, an older woman.  *Id.* ¶ 6.  The officers were able to

7    unscrew a connection of the padlocks without breaking the locks to see into the small rooms.  *Id.*

8    They could easily tell that each was a studio apartment.  The officers also asked Valente if they

9    could search her room.  She consented.  *Id.* ¶ 7.

10        After the searches of the four studio apartments, the officers asked if there were any more

11    rooms in the house.  Valente told them there was another room in the back.  *Id.* ¶ 7.  The officers

12    located it, saw that it was padlocked like El Flaco's and Mirian's rooms, and proceeded to break

13    in.  After discovering the drugs in this back room, officers asked Valente who lived there.  She

14    informed them that Martinez was the sole occupant.  Valente Decl. ¶ 7.

### LEGAL STANDARD

16        The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons,

17    houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.

18    "[T]he Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent

19    circumstances, that threshold may not reasonably be crossed without a warrant."  *Silverman v.*

20    *United States*, 365 U.S. 505, 511 (1961).

21        The Warrant Clause of the Fourth Amendment prohibits the issuance of any warrant except

22    one "particularly describing the place to be searched and the persons or things to be seized."  U.S.

23    Const. amend IV.  "By limiting the authorization to search to the specific areas and things for

24    which there is probable cause to search, the requirement ensures that the search will be carefully

25    tailored to its justifications, and will not take on the character of the wide-ranging exploratory

26    searches the Framers intended to prohibit."  *Maryland v. Garrison*, 480 U.S. 79, 84 (1999).  "The

27    validity of the warrant must be assessed on the basis of the information that the officers disclosed,

28    or had a duty to discover and to disclose, to the issuing Magistrate."  *Id.*  When a warrant that was

United States District Court
Northern District of California

5

valid when issued turns out to be overbroad, the validity of a subsequent search that falls outside

the area for which the warrant establishes probable cause "depends on whether the officers' failure

to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at

88.

### DISCUSSION

Martinez's motion to suppress raises two constitutional questions: (1) was the warrant

valid when issued or was it overbroad, and (2) was the execution of the overbroad warrant valid or

was it objectively unreasonable. Because I conclude that the execution of the warrant was

objectively unreasonable, and the evidence must be suppressed, I do not address whether the

warrant was invalid when issued. For purposes of assessing the reasonableness of the officers'

execution of the warrant, I will assume that the warrant was valid at the time it was issued.

## I.  EXECUTION OF THE WARRANT

The government argues that the execution of the warrant was reasonable given the

information that officers had at the time. Second Opposition to Motion to Suppress ("Oppo. #2")[3]

at 3 (Dkt. No. 61). It does not dispute that the upper unit at 751 Madrid was used as a multi-unit

building, not a single family residence, but notes that prior to entering the building "the house

appeared to be a single-family residence with one front door and one mailbox to the left of that

door." *Id.*[4]

_____

[3] The government filed three oppositions to Martinez's Motion to Suppress. Over objections from Martinez, I granted the government's request for a month-long extension to file its initial response. First Opposition to Motion to Suppress ("Oppo. #1") (Dkt. No. 58). Then, days before the scheduled hearing in this case, the government concurrently filed a motion for leave to file a sur-reply, (Dkt. No. 60) and a sur-reply, to address what it asserted were new issues raised in Martinez's reply. Oppo. #2. This sur-reply largely addressed arguments that could have been and should have been made in the government's initial response. Neither opposition addressed *Mena v. Simi Valley*, 226 F.3d 1031 (9th Cir. 2000), which is directly on point. Government counsel was not prepared to discuss it at oral argument. This precipitated a third opposition; this time, the government did not even request leave to file it. Third Opposition to Motion to Suppress ("Oppo. #3") (Dkt. No. 65). There are obvious deficiencies in the procedure employed by the government, as well as the substance of the arguments. In the interest of considering all of the available facts and arguments, the government's Request for Leave to File a Sur-Reply is GRANTED and I reviewed the third opposition as well. The government has still offered no plausible response to *Mena*.
[4] The government states that 751 Madrid Street appeared to be a single-family residence from the outside, which is inconsistent with its understanding that 751 Madrid had a basement apartment with a separate door and mailbox and that these were clearly visible from the outside. Discenza

United States District Court
Northern District of California

The government contends that police officers could not have known that the main unit at 751 Madrid was used as a multiple-unit building while executing the warrant because there were "no markings, door bells, or any indicia on any doors of the interior rooms to indicate any separate residences inside that house." Oppo. #2 at 3. It adds that "officers did not know that the rear room was a bedroom or that defendant Josue Olman Martinez, a/k/a "Panita," lived in that room, until after entry into the room." *Id.*

Martinez argues that the officers acted unreasonably in searching his room because, while they were executing the warrant, they should have determined it was overbroad because the rooms at 751 Madrid were maintained as separate residences. He points to *Mena v. City of Simi Valley*, a civil rights case, in which the Ninth Circuit affirmed a district court's denial of summary judgment on the issue of qualified immunity, finding that a jury could conclude the officers acted unreasonably in executing an overbroad warrant at a multi-unit building. 226 F.3d 1031, 1037 (9th Cir. 2000).

**A.  *Mena v. Simi Valley***

In *Mena*, a magistrate judge issued a warrant to search the entire property at 1363 Patricia Avenue, where the primary suspect in a drive by shooting lived, to search for the gun used in the shooting. *Id.* at 1034. A witness informed officers that the property was a "poor house," a "residence with a large number of subjects residing in a residence designed for one family." *Id.* Two officers had briefly been to the property before and had observed padlocks on some of the doors. *Id.* at 1035. When they executed the warrant, officers entered the building and saw that some of the rooms were locked and many had padlocks on the outside of the doors. *Id.* The officers forced entry to the locked rooms and recognized that the rooms were set up as studio

Decl. ¶ 7. Despite this, the government asserts that the officers knew that they did not have probable cause to search this basement apartment. As it appears that officers did not conduct a search of the basement apartment, and because Martinez did not live there, he lacks standing to challenge the validity of the warrant on that basis. Valente Decl. ¶ 8. Of more significance is that Witness 2 told the police that he believed a mother with two young children lived on the premises with Montoya's mother, which calls into doubt the assertion in the warrant that the upper unit was a single family residence. But for the purposes of this discussion, I accept the government's assertions that, prior to entry, officers believed 751 Madrid referred to the main, upper unit, and that it was a single family residence.

United States District Court
Northern District of California

1   apartment type units.  *Id.* at 1038.

2          The Ninth Circuit concluded that it was reasonable for the police to believe, at the time

3   they applied for the warrant, that they had probable cause to search the entire building.  *Id.* at

4   1038-39.  However, it determined that a reasonable jury could conclude that officers acted

5   unreasonably in continuing with their search after they had reason to know that the padlocked

6   rooms were individual residences.  *Id.*  The court affirmed the district court's ruling that "the law

7   is well established that the officers were required to discontinue the search of Plaintiffs' property

8   not reasonably in [the suspect's] control as soon as they discovered that there were other separate

9   units on the property and therefore were put on notice of the risk that they might be in a portion of

10  the property erroneously included within the terms of the warrant."  *Id.* at 1039.

11         The facts here largely mirror those of *Mena*.  As in *Mena*, prior to entering 751 Madrid,

12  officers were aware of a number of facts that, though not necessarily conclusive, indicated 751

13  Madrid might contain several living units.  First, Witness 2 had informed officers that Murga lived

14  in the building but "like two families also live separately there."  Mot. Ex. D-1 at 7.  Witness 2

15  had explained that one family lived in the basement unit and that another family lived in the main

16  unit near the front left window.  Mot. Ex. D-3 at 3.  After Witness 2 offered this explanation,

17  Lieutenant Dedet (who interviewed Witness 2 with Discenza) remarked, "so they must be

18  subletting rooms."[5]  Mot. Ex. C-1 (Dkt. No. 52-3).  Although the government urges that this

19  speculation by Dedet "was not based upon evidence, or any statements made by Witness No. 2,"

20  this conclusion is a reasonable inference to draw from Witness 2's direct statements about the

21  living arrangements at 751 Madrid.  Oppo. #2 at 4 n1.  Officers later asked Witness 2 whether

22

23  [5] The government objects to this characterization of the recorded interview and notes that the
    government's transcript and translation, which was certified as accurate in its contents and
24  translations, set forth Dedet's statement as "So there must be [unintelligible] rooms.  Oppo. #2 at 4
    n1.  The government asserts that it is "convenient for defendant to insert the word 'subletting'
25  when that word could not be heard on the recording."  *Id.*  Actually, the reverse is true.  Of course,
    that the government's court reporter or translator could not make out this sentence does not mean
26  the defense cannot offer its own interpretation and transcript of the statement.  Martinez conducted
    an independent review of Witness 2's interviews and provided his own certified transcript and
27  translation of those audio recordings and these are no less valid than the government's versions.
    Most importantly to me, Martinez  also included a copy of the interview's audio recording as
28  Exhibit C-1 to his motion, on which Dedet appears to say, quite clearly, "so they must be
    subletting rooms."

United States District Court
Northern District of California

there were any other units or apartments behind the house.  Ex. C-3 at 6.  Although Witness 2 did not know whether there were additional units in the back, this question, along with Dedet's speculation about subletting, reveal a likely understanding on the part of the officers prior to the search that such subletting and informal multi-unit arrangements are common in San Francisco properties and that 751 Madrid might contain several units.

The officers' subjective understandings of the arrangement of the property prior to entry, even if they were speculative, are still important.  These impressions weigh on whether the officers acted reasonably in failing to realize the property was a subdivided multi-unit building while executing the warrant.  The more officers were primed to believe that the building might be a multi-unit building prior to entry, the less likely that the search was objectively reasonable once confronted with indisputable evidence of separate units.

In addition to his statements about other families living separately at 751 Madrid, Witness 2 also gave officers reason to believe that Murga lacked control or access to the entire property. When officers asked Witness 2 where he thought the guns were hidden in the house, he told them he thought they must be in Murga's room because they would be found if they were anywhere else.  Ex. D-3 at 6.  Dedet explained to Discenza that "he doesn't know where they hide the guns but he suspects that that's the only place that they can be hidden, without anybody else else [sic] finding them."  *Id.*  Witness 2's impression of 751 Madrid was that Murga had limited control and use over the space, and that other residents of the property were not involved in Murga's potential wrongdoing.  This put the officers on notice that portions of the property might not be within Murga's control, and could therefore fall outside the scope of the warrant.

During their execution of the warrant, officers became aware of additional facts that put them on notice that 751 Madrid contained separate units, just as in *Mena*.  After officers entered 751 Madrid, they knocked on Ms. Valente's door and discovered that she lived there with her son. Oppo. #2 at 3.  Ms. Valente's presence corroborated Witness 2's statement that another family lived in the main house separately from Murga.  Also, while executing the warrant, officers appeared to recognize that Ms. Valente's room was a separate unit because they sought her consent to search it.  *Id.*

9

1    Ms. Valente then directed officers to Murga's room, which was locked.  *Id.*  Officers broke

2    into Murga's room and began to search it.  *Id.*  But in addition to Ms. Valente's and Murga's

3    locked rooms, officers could see two additional padlocked doors that looked like small rooms or

4    closets.  Valente Decl. ¶ 5.  Police did not ask Ms. Valente what was in these rooms or if they

5    belonged to other residents.  *Id.*  Instead, they broke into both rooms, which belonged to El Flaco,

6    an 18-20 year-old man, and Mirian, an older woman, respectively, and were able to see that these

7    were private and separate living spaces.  *Id.*

8    After this, the officers asked Valente if there were any other rooms in the house.  She told

9    them there was another room in the back.  *Id.* ¶ 7.  This room was located off an outdoor patio past

10   the kitchen and was padlocked, just like the two studio apartments the officers had just broken

11   into.  The officers broke the padlock on this door and entered the room.

12   Prior to breaking the padlock to Martinez's room, the police had ample evidence that the

13   property at 751 Madrid Street was a multi-unit property, housing persons unrelated to Murga or

14   the purpose of the search, and that they did not have probable cause to search areas of the property

15   that were not reasonably in Murga's control.  On these facts, so close to those in *Mena*, I conclude

16   that the officers acted unreasonably in searching Martinez's room.

17   **B.  The Government's Response to *Mena***

18   The government has offered no persuasive explanation why this case differs from *Mena*, or

19   why the officers' execution of the warrant was reasonable.  In its third response to this motion to

20   suppress, the government attempts to distinguish *Mena* by noting that (1) in this case when

21   officers executed the warrant Ms. Valente and her son were the only residents home, whereas in

22   *Mena* a number of residents were home; (2) El Flaco's and Mirian's rooms looked like closets

23   from the outside and Sergeant Discenza, the affiant, did not know about them; (3) officers had no

24   reason to know that the last locked room was a bedroom or that Martinez lived there; and (4)

25   Rufina Murga had access to or was in control of the locked rooms.  Oppo. #3 at 3-5.  None of

26   these excuses is worth the candle.

27   **1.  Only Ms. Valente and Her Son Were Home**

28   The government does not explain why it matters that Ms. Valente and her son were the

*United States District Court*
*Northern District of California*

10

only residents home, whereas in *Mena*, multiple people were home.  Before they arrived, the police knew Murga lived in the house.  Once they entered, they confirmed that Ms. Valente and her son lived there separately.  Once they opened El Flaco's and Mirian's doors, they knew there were additional residents living there as well.  It was not necessary for any other residents to be present for police to determine that 751 Madrid was being used as a multi-family residence.

### 2.  El Flaco's Room and Mirian's Room Looked Like Closets

Next, the government argues that El Flaco's and Mirian's rooms looked like closets and that Discenza did not know they were there when he sought the warrant.  That is precisely what happened in *Mena*, where the police saw a number of padlocked doors but did not know what was behind them until they broke in, at which point they should have realized that the building was a multi-unit residence.  It is irrelevant that the doors looked like closets from the outside because, as the government admitted at the hearing, the police broke into these rooms and saw what was inside.  Once the officers opened these doors they were disabused of any misconception that these doors were to closets and they could see that they were, in fact, to small studio apartments.

Although Discenza, the affiant, declared that he was unaware that these rooms existed, the government does not explain why this matters.  The government does not dispute that the police searched these rooms prior to searching Martinez's room.  While Discenza may have failed to notice these rooms, other officers clearly did not.  And based on his declaration, it appears that Discenza did not conduct the search of Martinez's room.  His subjective awareness of the two front rooms does not impact whether the officers who did search Martinez's room acted reasonably.  It is not only the affiant for a warrant who must act reasonably in executing it.

### 3.  Police Did Not Know Martinez's Room Was a Bedroom

Next, the government argues that it was reasonable for officers to enter Martinez's room because they did not know it was a bedroom, they did not know that Martinez lived there, and they believed there might be guns hidden inside.  Oppo. #2 at 3.  While the officers could not have known, definitively, that Martinez's room was a bedroom before they opened the door, all the evidence available suggested that such was the case.  They had searched two rooms with locks and two others with padlocks just like Martinez's.  All four were studio apartments.  It is worth noting

11

United States District Court
Northern District of California

1  that after searching the four other bedrooms in the main house, officers asked Ms. Valente if there

2  were any other rooms and she indicated there was a room in the back.  Because Ms. Valente

3  described Martinez's room as a "room," the officers should have realized that it was not some

4  other kind of space, such as a closet or storage area.  Further, given the context, where police had

5  just searched four other bedrooms and asked if there were any other rooms, it is likely that Ms.

6  Valente and the police both understood her statement, that there was another room in the back, to

7  mean that there was another bedroom in the back.  The government offers no explanation or facts

8  that would suggest it was reasonable, based on this exchange, for the officers to believe Martinez's

9  room was not a bedroom.

10      The government highlights that there was no mailbox, doorbell, or number visible from the

11  outside of Martinez's room indicating that it was a separate unit.  Oppo. #2 at 3.  That was true of

12  the other four units as well.  While doorbells or numbers may help indicate a separate unit, they

13  are not prerequisites.  *United States v. Greathouse*, 297 F. Supp. 2d 1264, 1274 (D. Oregon Oct.

14  20, 2003) (There is no "support for the assumption that unrelated people who share a house, but

15  maintain separate bedrooms have no independent right to privacy in bedrooms maintained for their

16  exclusive use.").  Knowing that the other four rooms were maintained as separate, exclusive units,

17  even though none of these rooms had mailboxes, doorbells, or individual numbers, it was

18  unreasonable for the officers to rely wholly on formal indicia of separate residences to justify

19  breaking into Martinez's room.

20      As the Supreme Court explained in *Garrison*, officers are "required to discontinue the

21  search of [an individual's] apartment as soon as they discover[] that there [are] two separate units

22  [at the property] and therefore [are] put on notice of the risk that they might be in a unit

23  erroneously included within the terms of the warrant."  480 U.S. at 87.  By the time officers got to

24  Martinez's room, they had searched the four other rooms at the house.  They knew, or should have

25  known, that 751 Madrid was being used as a multi-unit property.  Regardless of whether they

26  knew Martinez's room was a bedroom, they were obligated to limit their search to the areas

27  reasonably under Murga's control.

28      That the officers may have honestly believed that there could be guns in Martinez's room

does obviate their need for a valid warrant.  Once officers learned that 751 Madrid was a multi-unit building they were required to limit their "search to the specific areas and things for which there is probable cause to search" – which, at the time, were only those areas that officers believed were under Murga's control.  *Garrison*, 480 U.S. at 84.  The government's argument that officers acted reasonably because they did not know Martinez's room was a bedroom is not persuasive.

### 4.  Murga Had Access to the Entire Property

The government finally argues that it was reasonable for officers to search the entire property because Murga had control or access to the entire premises.  To be sure, "a warrant is valid when it authorizes the search of a street address with several dwelling if the defendants are in control of the whole premises, if the dwellings are occupied in common, or if the entire property is suspect."  *United States v. Alexander*, 761 F.2d 1294, 1301 (9th Cir. 1985).  But it is critical to evaluate the validity of the search based on what the officers knew at the time.  "[W]e must judge the constitutionality of [the officers'] conduct in light of the information available to them at the time they acted."  *Garrison*, 480 U.S. at 85.

The government points to the Declaration of Ms. Valente, in which she explains that Murga was the master tenant of the property, had keys to the padlocks on El Flaco's, Mirian's, and Martinez's doors, had been in Martinez's room while he was not there, and controlled which visitors tenants could have at the property.  Valente Decl.  ¶ 3-4.  But as Martinez points out in his reply, there is no indication that officers had knowledge of any of these facts at the time they were executing the warrant.  These statements about Murga's control over the property could not have factored into the officers' probable cause determination, or the reasonableness of the officers' actions, if they were not learned until well after the warrant was executed.

The only information that officers clearly had on the issue of control at the time they executed the warrant was the statement from Witness 2 that the gun could only be in Murga's room, because if it was anywhere else, it might be found by the other residents.  This indicated Witness 2's belief that Murga did not have control over the entire property.  In the absence of any evidence undermining this impression, it was not reasonable for officers to believe that Murga controlled the entire unit.

13

United States District Court
Northern District of California

1   Moreover, when officers searched Martinez's room, Valente had already shown officers

2   Murga's room and gave no indication that Murga occupied any other space.  And, because

3   Martinez's room was padlocked, unlike Murga's room, there was no reason for the officers to

4   believe that it was part of a common space or that Murga had access to it.  Officers should have

5   known that by opening Martinez's door they were likely entering a separate unit that had been

6   erroneously included in their warrant and that they did not have probable cause to search it.

7   Prior to executing the warrant, officers had reason to believe that 751 Madrid might be set

8   up as a multi-unit residence: they had been told that a family lived separately in the home; they

9   could see, and had been told that there was a separate basement unit, and they appeared to have a

10  general understanding that single family homes in San Francisco are often subdivided and

11  subletted.  Once the officers began executing the warrant, they saw, conclusively, that 751 Madrid

12  was a multi-unit residence.  They met Ms. Valente and her son and confirmed Witness 2's

13  statement that a family lived separately in the residence.  They saw that a number of doors were

14  locked or padlocked.  And they saw, after breaking into the first two padlocked rooms, that they

15  were both private units.  The government offers no explanation why it was nevertheless

16  reasonable, at this point, for the officers to believe the property was a single family residence.  The

17  government offers no credible argument that it was reasonable for the officers, once realizing the

18  property was a multi-unit residence, to believe that Martinez's room nevertheless fell within the

19  scope of their warrant – which was limited to Murga's residence and the areas within her control.

20  In light of what the officers knew, or should have known, that the building was a multi-unit

21  residence, and in the absence of any plausible argument or explanation why officers failed to

22  realize that their warrant was overbroad, I conclude that it was objectively unreasonably for the

23  officers to fail to realize the overbreadth of their warrant.

24  Poor people, just like richer ones, are entitled to be free from unreasonable searches and

25  seizures.  The living arrangements at 751 Madrid are not unusual – there are many people, in San

26  Francisco and elsewhere, of limited financial means who have no option but to live in informal,

27  subdivided properties that may appear to be single-family residences from the outside.  Law

28  enforcement cannot ignore overwhelming evidence that a warrant is overbroad when they realize

14

that a property described as "single family" is actually multi-unit.  Individuals living in private, separate rooms in such properties must be afforded the same Fourth Amendment protections as everyone else.

## CONCLUSION

Because the officers' failed to stop searching individual rooms once they knew, or should have known, that 751 Madrid was a multi-unit residence, it was objectively unreasonable for them to break into Martinez's room.  Martinez's motion to suppress is GRANTED.

**IT IS SO ORDERED**.

Dated: November 22, 2016



WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California

15